IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL H. PRICE AND ROGER K. FREY

    Plaintiffs,

v.

SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA

    Defendant

Case No. 1:97CV975

## PLAINTIFFS' AMENDED COMPLAINT

PLAINTIFFS, Michael H. Price and Roger K. Frey sue the Defendant SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA and for their complaint allege that:

### JURISDICTION

1. This Court has jurisdiction pursuant to 28 U.S.C. Section 1605 (a)(7), as amended, 1996.

2. As required by 28 U.S.C. §1605(a)(7), on two previous occasions PLAINTIFFS offered to arbitrate pursuant to international rules of arbitration. The original of said first offer was filed contemporaneously with PLAINTIFFS' original Complaint. A copy of that Offer was served by international mail and received by the Ministry of Foreign Affairs, Tripoli, Libya in February, 1997. More than a reasonable time passed. Defendant did not accept PLAINTIFFS' offers to arbitrate. Because Defendant SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA failed to agree to any arbitration, the condition to jurisdiction established by 28 U.S.C. §1605(a)(7) has been satisfied.

3. This Court has personal jurisdiction over Defendant pursuant to 28 U.S.C. §1330 as described below.

## PARTIES

4. At all times material hereto, PLAINTIFF Michael H. Price was and is a citizen of the United States of America and is a resident of the State of Texas.

5. At all times material hereto, PLAINTIFF Roger Frey was and is a citizen of the United States of America and is a resident of the State of California.

6. Defendant Socialist People's Libyan Arab Jamahiriya is a foreign sovereign. Since December, 1979, it has been and remains designated as a terrorist nation as that term is defined in the Foreign Sovereign Immunities Act as amended. Because of its activities, as alleged in this Complaint, all of which violate the norms of *jus cogens* as alleged in paragraph 18 below, the Defendant is subject to the jurisdiction of this Honorable Court under the Foreign Sovereign Immunities Act.

7. Because of its illegal acts of terrorism, hostage taking, wrongful detention and torture directed to the PLAINTIFFS, as hereinafter alleged, Defendant does not enjoy the benefit of sovereign immunity regarding the PLAINTIFFS' claims.

## COUNT I - HOSTAGE TAKING AND TORTURE

8. PLAINTIFFS reallege and incorporate herein by reference the allegations of paragraphs 1 through 7.

9. On or about March 19, 1980, PLAINTIFFS Michael H. Price and Roger K. Frey were arrested arbitrarily within the sovereign territory of Defendant. PLAINTIFFS were arbitrarily detained solely because they were Americans. As described below, PLAINTIFFS' arrests and detention were the result of discriminatory decisions directed towards PLAINTIFFS because, as Americans, they would serve as hostages for future exchange. Although there was no evidence or other information to support Defendants' accusations, PLAINTIFFS were told they had been arrested

2

because they were spies for the United States government. After months of incarceration, PLAINTIFFS were told they were charged with spreading anti-Libyan propaganda. Finally, after 105 days of incarceration, during which PLAINTIFFS were subjected to continuing extrajudicial acts of torture, as that term is described under the Torture Victim Protection Act of 1991, and Defendant's agents, acting in their official capacities detained PLAINTIFFS as hostages for future exchange, PLAINTIFFS were tried for taking photographs for illegal purposes. PLAINTIFFS were acquitted. This complaint seeks redress for PLAINTIFFS wrongful detention as hostages and for the torture inflicted upon the PLAINTIFFS during their incarceration.

10. Following their arrest on March 19, 1980, PLAINTIFFS were detained overnight in a jail operated by the Secret Police of Libya. On the morning of March 20, 1980, PLAINTIFFS were transported to the offices of Ministry of Justice of the government of Libya. As discussed in paragraph 12 below, PLAINTIFFS were told that their arrest and detention was for the purpose of holding them as hostages until their release would be negotiated in exchange for Libyan agents which Defendant expected would be arrested and detained in the United States.

11. On or about March 20, 1980, PLAINTIFFS were interrogated by Hassan Ben Younis, Head of the Department for the Prosecution for the Security of the Revolution and other employees of Defendant who were working in that department, otherwise referred to as the Office of the Revolutionary Prosecutor. During this interrogation, several of those persons from the Office of the Revolutionary Prosecutor spoke English. Those English speaking persons from the Office of the Revolutionary Prosecutor, including Hassan Ben Younis ( who spoke some English but mostly spoke through an interpreter), all acting in their official capacities, accused the PLAINTIFFS of being spies in the employ of the Central Intelligence Agency. Defendant's agents demanded that

PLAINTIFFS each sign a confession acknowledging that each was a spy for the United States government and worked for the CIA. PLAINTIFFS refused.

12. During PLAINTIFFS' interrogation on March 20, 1980, the English-speaking employees of Defendant, acting in their official capacities, acknowledged that Defendant intended to use PLAINTIFFS as hostages. Specifically, Defendant's agents and employees informed both PLAINTIFFS that:

    a. Defendant intended to obtain PLAINTIFFS' confessions and then to prosecute and convict PLAINTIFFS as spies; and

    b. Upon their conviction, Defendant Libya would use PLAINTIFFS as hostages who would be exchanged in the future for Libyan agents which Defendant Libya expected would be arrested in the United States when the role of those agents was discovered. Defendant's employees indicated that Libyan agents were in the United States to implement Libya's program of planned assassinations of expatriate Libyan dissidents living in the United States.

13. The following threat was made to PLAINTIFFS to assure that they understood that the acts of torture which were to be thereafter inflicted upon them, as more particularly described in paragraphs 19, 20, 22, 27, 28, 29, 30, and 31 below, were designed to force PLAINTIFFS to make false confessions. These acts of torture and other abuses against PLAINTIFFS which violated the norms of *jus cogens* were not isolated incidents but rather took place in the context of the Defendant's efforts to coerce confessions from PLAINTIFFS and to punish PLAINTIFFS solely because they were being discriminated against as Americans. Specifically, on or about March 24, 1980, PLAINTIFFS were interrogated in English by Haj Imberge, who was acting in his official capacity as an assistant prosecutor in the Office of the Revolutionary Prosecutor. PLAINTIFFS were presented with a paper written in Arabic. Haj Imberge told PLAINTIFFS that the document was an

4

admission by the PLAINTIFFS that they were American spies. PLAINTIFFS then asked for a translation so they could determine the extent of the admissions asked of them. The assistant prosecutor, in his official capacity, informed PLAINTIFFS that if they refused to sign without being provided an Arabic-English translation, that he would see to it that such arrogant Americans would be taught a lesson and would be treated in prison in accordance with their arrogance until they admitted that they were spies. The treatment referred by Haj Imberge were the ongoing acts of torture and cruel and inhuman treatment as described below.

14.  During the Defendant's interrogations of PLAINTIFFS between March 20 through 24, 1980, the English speaking employees of Defendant, acting in their official capacities, acknowledged that the Defendant's efforts were not designed to serve any legitimate purpose and were not part of any legitimate sanction. In addition to admitting that PLAINTIFFS were being held as hostages as described in paragraph 12 above, said employees stated that their efforts were to:

   a.  bolster Libya's political alliances with and otherwise supporting the revolutionary Iranian government then holding Americans as prisoners and hostages in the United States Embassy in Teheran, Iran; and

   b.  allow Libya to enjoy the benefit of propaganda and political leverage in the world community to counter expected Western outrage concerning a wave of assassinations that the government of Libya had directed toward expatriate Libyans living in exile.

15.  After their initial interrogations, PLAINTIFFS were transported to and incarcerated in the political section of the Gedeidah prison complex, a former British prison located approximately fifteen (15) miles outside Tripoli, Libya and operated by the Secret Police of Defendant Libya.

16. Throughout their detention in prisons operated by agencies of the government of Defendant Libya, PLAINTIFFS were subjected to consistent acts of torture, as that term is defined by law, by Defendant and its agents and employees, acting in their official capacities, to coerce PLAINTIFFS to confess to being American CIA operatives and to compel them to implicate Libyan co-conspirators and because they were discriminated against based upon their status as American citizens.

17. To make PLAINTIFFS more vulnerable to the acts of torture inflicted upon them, PLAINTIFFS, while at Gedeidah prison, were:

   a. Confined with up to ten other prisoners in a cell approximately no more than 20 by 15 feet, with inoperable plumbing causing human wastes to overflow on the floor of the cell;

   b. Given urine soaked mattresses on which to sleep;

   c. Provided inadequate food which was either delivered in a wheelbarrow or thrown on the floor of the cell; and

   d. subjected to a disgusting, vile, and repugnant regimen which violated all standards of behavior accepted by civilized societies and violated the norms of *jus cogens*.

18. Throughout their incarceration, PLAINTIFFS were subjected to wrongful detention as hostages and to countless acts of physical and mental torture, none of which were isolated or arose only from, or was inherent in, or incidental to, lawful sanctions, as more fully described throughout the balance of Count I, including physical beatings, mock executions, threats of beatings and imminent death while in the presence of other prisoners being beaten and/or murdered, false declarations regarding the death of PLAINTIFF Price's mother, and withholding of medical treatment. The PLAINTIFFS were subjected to cruel, inhuman, and degrading treatment and punishment and therefore Defendant is guilty of violating the norms of *jus cogens*, acts from which

no derogation is permitted. The acts of Defendant cannot be recognized as acts of a sovereign and the prohibition against such mistreatment is found in all of the major international human rights treaties:

(a) Under Article 5 of the Universal Declaration of Human Rights adopted by the General Assembly of the United Nations on December 10, 1948, no person shall be subject to torture or to cruel, inhuman or degrading treatment or punishment. Under Article 9 of the Universal Declaration of Human Rights, no person shall be subjected to arbitrary arrest or detention.

(b) Under Article 7 of the International Covenant on Civil and Political Rights, adopted by the General Assembly of the United Nations on December 16, 1966, no person shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. Under Article 9, no person shall be subjected to arbitrary arrest or detention.

(c) Under Article 5 of the American Convention on Human Rights ("Pact of San Jose, Costa Rica," November 22, 1969), no person shall be subjected to torture or to cruel, inhuman, or degrading punishment or treatment. Under Article 7 of the American Convention, no person shall be subjected to arbitrary arrest or imprisonment.

(d) Under Article 2 of the Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment adopted by the General Assembly of the United Nations on December 9, 1975, "any act of torture or other cruel, inhuman or degrading treatment or punishment is an offence to human dignity and shall be condemned as a denial of the purposes of the Charter of the United Nations and as a violation of the human rights and fundamental freedoms proclaimed in the Universal Declaration of Human Rights."

(e) Under Article 5 of the African Charter on Human and Peoples' Rights, all forms of exploitation and degradation of people are prohibited, including torture and cruel, inhuman or degrading punishment and treatment.

(f) Under Article 2 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted by the General Assembly of the United Nations on December 10, 1984, no order from a superior officer or public authority nor any exceptional circumstance whatsoever may be invoked as a justification for torture. Under Article 16 of the Convention, all the provisions of the Convention are without prejudice to the provisions of any other international instrument or national law which prohibits cruel, inhuman or degrading treatment or punishment.[1]

19. PLAINTIFFS were subjected to frequent, unwarranted acts of mental torture as defined in The Victim Protection Torture Act and as included under 28 U.S.C. §1605(a)(7) as amended, 1996. Specifically, PLAINTIFFS were subjected to prolonged mental harm caused by and/or resulting from the intentional infliction and threatened infliction of severe physical pain and/or suffering, threats of imminent death, and threats that others would be subjected to severe pain, suffering and/or imminent death as a result of PLAINTIFFS refusals to acquiesce to Defendant's illegal demands.

20. As an example of the regimen described in paragraph 17(d) above and as part of its cruel and inhuman treatment of PLAINTIFFS, each day for two weeks following the May 24, 1980

---

[1] In October 1990 the Senate gave its advice and consent to this Convention with the reservation the United States considers itself bound by Article 16 of the Convention regarding cruel, inhuman and degrading treatment or punishment to the extent that this term has the same meaning as the kind of cruel and unusual treatment or punishment prohibited by the Fifth, Eighth or Fourteenth Amendment of the United States Constitution.

interrogation, both PLAINTIFFS were removed from their cell by prison guards and required to clean squat communal toilets used daily by approximately 75 people. Because the toilets were inadequate for the number of prisoners using them, the toilets were clogged and backed up. Mounds of human excretion surrounded each toilet. No effective cleaning instruments were provided. PLAINTIFFS were forced to use their ungloved hands to remove the human excrement and place it into plastic bags. While PLAINTIFFS were attempting to clean the clogged toilets and remove the mounds of human excrement, prison guards would continue to use the toilets and then immediately require PLAINTIFFS to remove fresh human feces with their hands. After completing such tasks, PLAINTIFFS were denied any access to water or other facilities to clean the feces from their clothes and bodies.

21.  Throughout their incarceration, PLAINTIFFS were continuously and intentionally beaten. Through these beatings, PLAINTIFFS were tortured. PLAINTIFFS were violently clubbed, kicked and beaten, suffering blows to the head, ears, kidneys and genitalia. Defendant's employees used truncheons as well as their hands.

22.  On several occasions the beatings described generally in paragraph 20 above occurred in the presence of high ranking employees of the Secret Military Police, the Libyan Army and the Office of the Revolutionary Prosecutor.

23.  Each of the beatings generally described in paragraph 20 above were not isolated events, were of an extreme nature and extended duration, and were inflicted in a manner calculated to be extremely cruel and to cause agonizing and excruciating pain.

24.  During many of the beatings described generally in paragraph 20 above, PLAINTIFFS believed that they were near death. At other times, PLAINTIFFS wished for death

as the only means to end their continued torture and the extremely cruel acts inflicted upon PLAINTIFFS.

25. The beatings described generally in paragraph 20 above, were initially intended to cause PLAINTIFFS to sign false confessions admitting to being employees of the CIA or to being American spies. However, the beatings continued after PLAINTIFFS ultimately agreed to sign and did sign whatever documents in Arabic that Defendant requested.

26. The beatings constituted acts of torture by agents of Defendant Socialist People's Libyan Arab Jamahiriya as defined in 28 U.S.C. 1605 (a)(7), as amended, 1996.

27. An early act of mental torture and confirmation of hostage taking occurred on or about April 7, 1980. PLAINTIFFS were visited in prison by a man who identified himself as Mr. Duabi. This person stated that he was an attorney assigned to their case. He informed the PLAINTIFFS that they would likely receive the death penalty for spying if they did not confess to being spies, or at best a lengthy prison sentence until they could be exchanged for any Libyan spies or assassins detained by the government of the United States. PLAINTIFFS requested an English translation of the confession document they had been asked to sign. None was produced. PLAINTIFFS never saw Mr. Duabi again. This episode was designed for the purposes of causing PLAINTIFFS to sign a confession that they were American spies and to increase PLAINTIFFS' fears of serious and grievous physical, mental and emotional pain and suffering which would be followed by their death.

28. Between April 13 and April 30, 1980 the acts of mental torture increased. On three occasions, PLAINTIFFS were removed from their cell and forced to watch either a beating or a killing of a fellow prisoner for the purpose of forcing PLAINTIFFS to confess to being spies for the CIA or the government of the United States. On each such occasion, PLAINTIFFS were bound and

tied to chairs and forced to observe their guards administer violent, severe beatings of other prisoners with truncheons as described in paragraphs 29, 30 and 31 below. The ostensible head of the prison, Major Braheim, was present at each of the three beatings and in his official capacity informed PLAINTIFFS that they would receive the same treatment as they were witnessing if they did not cooperate with the Revolutionary Prosecutor by signing a false confession that they were American spies.

29. As described in paragraph 28 above, on or about April 13, 1980, PLAINTIFFS were required to witness the beating of a Tunisian prisoner. The Tunisian prisoner was beaten severely and lost consciousness. The guards continued to beat him until he appeared to be dead.

30. As described in paragraph 28 above, on or about April 19, 1980, PLAINTIFFS witnessed the beating of a Libyan journalist. PLAINTIFFS were informed that the journalist was being beaten because he had spoken to PLAINTIFFS and had been of some assistance to PLAINTIFFS in coping with the difficulties of life in a communal cell in squalid conditions.

31. As described in paragraph 28 above, on or about April 28, 1980, Mahmood Banoon, a prisoner, was beaten to death by truncheons and with a hammer in the presence of PLAINTIFFS. The beating death of Mahmood Banoon was punishment for having shared with PLAINTIFFS some food he received from friends or relatives.

32. On or about April 10, 1980, the government of the United States severed its diplomatic relations Libya. On or about April 20, 1980, the United States attempted a military rescue of the hostages held in the United States Embassy in Teheran, Iran. These events caused an escalation both in the interrogation of PLAINTIFFS by employees of Defendant Libya and torture of PLAINTIFFS through an increase in the nature and extent of the intentional, extreme, violent and brutal treatment of PLAINTIFFS.