33. On or about April 30, 1980, PLAINTIFFS were again interrogated by Chief Revolutionary Prosecutor Hassan Ben Younis and two other Revolutionary Prosecutors, Haj Imberge and Ali Mohammed. In addition, Muhammad Ali al-Jadi, Secretary of Justice of the government of Defendant Libya and Dr. Ali Abdessalam al-Turaiki, Secretary for Foreign Affairs of the government of Defendant Libya were present. The PLAINTIFFS were told by prosecutor Hassan Ben Younis that they were being given one last chance to sign the confessions in Arabic or suffer the consequences they had seen befall their fellow prisoners as described in paragraphs 29, 30 and 31 above. PLAINTIFFS, fearing for their lives and physical safety, signed documents in Arabic without knowing what the contents of such documents were and without being provided an English translation.

34. Subsequent to the signing of the Arabic documents, the acts of torture as alleged in paragraphs 35 through 53 below continued solely for the purpose of torturing PLAINTIFFS arbitrarily against PLAINTIFFS as Americans.

35. Immediately following the signing of the confession document, PLAINTIFFS expected to be tried, convicted, sentenced and then exchanged as hostages for Libyan prisoners in the United States. While awaiting this process, PLAINTIFFS were subjected to continuing torture.

36. PLAINTIFFS, upon signing confessions, were blindfolded and transported in an automobile for approximately one-half hour at which time the vehicle was stopped. The secret police left the vehicle. PLAINTIFFS, sweated profusely and lost consciousness from heat prostration. While still unconscious, PLAINTIFFS were removed from the vehicle and regained consciousness.

37. After being removed from the automobile, PLAINTIFFS were taken to two ten feet by ten feet cells. PLAINTIFFS' blindfolds were removed. There was no furniture, windows,

ventilation or toilet facilities in the cells. A single light bulb burned overhead continuously. PLAINTIFFS were not allowed to leave these cells for the next seven days. During this period, PLAINTIFFS lost consciousness and were revived to consciousness several times. Defendant's guards, laughing and jeering at the circumstances in which PLAINTIFFS were placed, demonstrated that their actions were for sadistic pleasure and constituted torture as defined in 28 U.S.C. 1605(a)(7).

38. On two occasions as described in paragraph 39 and 40, while detained in the cells described in paragraph 37, both PLAINTIFFS were subjected to acts of torture through beatings and mock executions.

39. Two guards, employees of Defendant Libya, entered the cell of each PLAINTIFF. One guard pointed a rifle at PLAINTIFF Michael Price while the other guard severely beat Price with a truncheon on various parts of his body including but not limited to his head. After the beating, a third guard entered the cell and subjected Price to a mock execution. This guard placed the barrel of his rifle against this PLAINTIFF's temple. After a delay of several seconds, the guard pulled the trigger on the rifle. PLAINTIFF Price feared that his death was imminent.

40. The same mock execution as described in paragraph 39 was performed on PLAINTIFF Roger Frey after a similar violent and severe beating was performed on his body, including his head. PLAINTIFF Frey feared his death was imminent.

41. The conduct of Defendant's guards as alleged in paragraphs 38, 39 and 40 constituted torture under the Torture Victim Protection Act as adopted in 28 U.S.C. 1605(a)(7) and in Articles 1 and 16 of the Convention Against Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment, December 10, 1984, 23 I.L.M. 1027 (1987) as modified and similar treaties and constitute violations of the norms of *jus cogens*.

42. As a result of their beatings, each PLAINTIFF has suffered a serious and permanent hearing deficit.

43. On June 3, 1980, PLAINTIFFS were transferred from their confinement in political section of Gedeidah prison to Political Section 4 of Tripoli Central Prison, a prison under the control of the Libyan Army. The captain of the prison referred to the PLAINTIFFS as "CIA".

44. Defendant's mental torture continued after the June 3, 1980 transfer. During his confinement at Political Section 4 of Tripoli Central Prison, PLAINTIFF Michael Price was visited by a prosecutor from the Office of the Revolutionary Prosecutor. This individual gave PLAINTIFF Michael Price a telegram purporting to be from the State Department of the United States. The false telegram stated that PLAINTIFF Michael Price's mother had died. The prosecutor informed PLAINTIFF Michael Price that if he would provide a written list of Libyans who had assisted PLAINTIFFS in spying for the CIA, PLAINTIFF Michael Price would be released and allowed to attend his mother's funeral. Michael Price's mother was alive and well and living in Chicago, Illinois, where she continued to live until her death in the year 2000. The conduct of Defendant demonstrates that Defendant's actions were designed to inflict the utmost in mental and emotional pain and suffering and for torture as defined in 28 U.S.C. 1605(a)(7).

45. During their confinement in Political Section 4 of Tripoli Central Prison, PLAINTIFFS were frequently removed from a food line while awaiting their daily meal and tortured. When PLAINTIFFS were removed from the food line, they were intentionally, severely, relentlessly, and brutally beaten by guards with clubs in a manner to inflict the most extreme, severe and excruciating pain.

46. During their incarceration, both PLAINTIFFS developed medical problems of a serious nature as described in paragraphs 47, 48, 49 and 50 below. Defendant, to further torture the PLAINTIFFS, withheld medical treatment or medication.

47. PLAINTIFF Michael Price suffered from pneumonia and coughed up numerous blood clots. He further suffered from a urinary tract infection sufficient to prevent him from being able to urinate unless he inserted his fingers into his rectum and massaged his prostate.

48. PLAINTIFF Roger Frey was severely beaten, including but not limited to the area of his kidneys, causing him to pass blood in his urine.

49. Both PLAINTIFFS begged for medical treatment but were denied such by Defendant's prison officials. As such, both PLAINTIFFS believed that their deaths were imminent.

50. On numerous occasions both PLAINTIFFS were transported to the prison medical facility and forced to watch physicians providing medical treatment to other prisoners. PLAINTIFFS were informed by the prison officials that medical treatment would be given PLAINTIFFS if they would provide the names of co-conspirators who had assisted PLAINTIFFS in spying for the CIA. Such episodes caused PLAINTIFFS, serious mental and emotional pain and suffering in addition to the physical suffering from being denied medical treatment. As PLAINTIFFS had in fact not been spies for the CIA or any other agency, it was impossible for them to name Libyans who had assisted them.

51. During his confinement in Political Section 4 of Tripoli Central Prison, PLAINTIFF Roger Frey was singled out, removed from the food line and taken to a courtyard. PLAINTIFF Roger Frey was brought to a man wearing a red beret whom he was told was a martial arts expert. PLAINTIFF Roger Frey was threatened with being used as a practice dummy for the martial arts expert unless PLAINTIFF Frey divulged the identities of Libyans assisting him as a spy.

PLAINTIFF Roger Frey was unable to name any such person as no such person existed. The red beret martial arts expert proceeded to beat and kick PLAINTIFF Roger Frey. A group of Defendant's guards, were gathered on the roof of the building surrounding the courtyard to witness the beating of PLAINTIFF Frey. The guards on the rooftop cheered as the martial arts expert struck and kicked PLAINTIFF Roger Frey. The conduct of Defendant's prison guards, constituted torture as defined by law.

52. On or about July 1, 1980, PLAINTIFFS were both taken to an exercise area. Several German Shepard attack dogs were chained to stakes in the exercise area. PLAINTIFFS were placed in the center of the dogs, barely out of reach. The dogs snarled, barked and attempted to attack PLAINTIFFS. PLAINTIFFS were protected solely by the chains on the attack dogs which PLAINTIFFS believed could break at any moment. At approximately thirty minute intervals, the prison guards would throw meat to the dogs, causing them to start barking and snarling at PLAINTIFFS again and again. PLAINTIFFS were told by their prison guards that the only way they would be released was to divulge the identities of those Libyans who had assisted PLAINTIFFS in their spying operations. Because PLAINTIFFS had not engaged in any spying operation and there were no such Libyans, PLAINTIFFS were unable to identify such persons. PLAINTIFFS were detained in the dog pit for twenty-four hours and were in fear of their physical safety. The conduct of Defendant's prison guards, constituted torture as defined above.

53. The conduct of Defendant Libya, or its agents, servants or employees or the individuals named herein as described in paragraphs 11 through 52 was not incidental to any lawful sanctions. Such conduct was intentionally inflicted with the successful intent of inflicting extreme and severe pain beyond any pain which might result from an isolated incident or which might result from mere cruel, inhuman or degrading treatment Said acts of abuse constituted acts of torture by

agents of Defendant Socialist People's Libyan Arab Jamahiriya as defined by law. Such acts of torture were perpetrated upon PLAINTIFFS by agents of Defendant Socialist People's Libyan Arab Jamahiriya acting within the scope of the office, employment or agency by such agents at all times relevant hereto.

54. Following PLAINTIFFS acquittal of the crime with which they were charged, PLAINTIFFS were denied the right to leave Libya. PLAINTIFFS were denied the return of their passports for a period of approximately sixty (60) days. They were told by employees of Defendant Libya that PLAINTIFFS would not be allowed to return to the United States so long as their physical appearance reflected the results of the torture inflicted upon them. PLAINTIFFS were detained for sixty days to conceal the torture inflicted upon them.

55. As the proximate result of Defendant's misconduct, PLAINTIFFS have been seriously and permanently damaged both physically and mentally.

  a. PLAINTIFFS suffered extreme physical and mental abuse.

  b. PLAINTIFFS continue to suffer from claustrophobia, insomnia and post traumatic stress disorder, as diagnosed by psychiatrists well experienced in the diagnosis and treatment of hostages and kidnap victims.

  c. PLAINTIFFS were each subject to continuous pain and suffering for the period of confinement in a Libyan prison and thereafter.

  d. Each PLAINTIFF suffered serious and permanent residual effects as a result Defendant's misconduct, including a loss of some hearing ability.

  e. PLAINTIFFS have suffered loss of income and wages as the proximate result of Defendant's misconduct which is ongoing and permanent.

## COUNT II - ASSAULT AND BATTERY

56. PLAINTIFFS reallege the allegations of paragraphs 1 through 6 and 8 through 55.

57. The facts alleged herein above give rise to a claim for relief on the common law theories of assault and of battery.

58. PLAINTIFFS are entitled to a judgment for damages based on numerous acts of assault and of battery wrongfully committed by agents, servants or employees of Defendant.

## COUNT III - INTENTIONAL INFLICTION OF MENTAL DISTRESS

59. PLAINTIFFS reallege the allegations of paragraphs 1 through 6 and 8 through 55.

60. The facts alleged herein above give rise to a claim for relief on the theory of intentional infliction of mental distress.

61. PLAINTIFFS are entitled to a judgment for damages based on the intentional infliction of mental distress beyond the bounds of behavior tolerated by a civilized society and committed by agents, servants or employees of Defendant, including but not limited to Hassan Ben Younis, Haj Imberge, Ali Mohammed and Major Braheim.

## COUNT IV - ACTS OF INTERNATIONAL TERRORISM

62. PLAINTIFFS reallege the allegations of paragraphs 1 through 6 and 8 through 55.

63. The acts described in herein by reference were violent acts and acts which were dangerous to human life. The acts of Hassan Ben Younis, Haj Imberge, Ali Mohammed and Major Braheim, acting in concert with one another constituted a conspiracy to injure, oppress, threaten and intimidate PLAINTIFFS. Had such acts been committed within the United States, such acts would have been a crime, specifically, a violation of 18 U.S.C. §241. Such acts fall within the definition of international terrorism found in 18 U.S.C. §2331.

64.     PLAINTIFFS are entitled to a judgment for money damages by reason of the acts of international terrorism pursuant to the provisions of 18 U.S.C. §2333(a) and for threefold such an amount awarded and for costs of this suit including but not limited to reasonable attorneys' fees.

## COUNT V- CRUEL, INHUMAN, AND DEGRADING TREATMENT

65.     PLAINTIFFS reallege the allegations of paragraphs 1 through 6 and 8 through 55.

66.     The facts alleged herein above give rise to a claim for relief on the theory of cruel, inhuman, or degrading treatment.

67.     PLAINTIFFS are entitled to a judgment for damages based on the cruel, inhuman, or degrading treatment wrongfully inflicted by agents, servants or employees of Defendant.

## COUNT VI- ARBITRARY DETENTION

68.     PLAINTIFFS reallege the allegations of paragraphs 1 through 6 and 8 through 55.

69.     The facts alleged herein above give rise to a claim for relief on the theory of arbitrary detention.

70.     PLAINTIFFS are entitled to a judgment for damages based on the arbitrary detention wrongfully caused by agents, servants or employees of Defendant.

WHEREFORE, PLAINTIFFS, respectfully request the following relief:

1.     Compensatory damages in excess of Twenty Million Dollars ($20,000,000.00) as to PLAINTIFF Michael H. Price and interest thereon;

2.     For treble damages in the amount of Sixty Million Dollars ($60,000,000.00) pursuant to 18 U.S.C. §2333(a) as to PLAINTIFF Michael Price and interest thereon;

3.     Compensatory damages in excess of Twenty Million Dollars ($20,000,000.00) as to PLAINTIFF Roger K. Frey;

4. For treble damages in the amount of Sixty Million Dollars ($60,000,000.00) pursuant to 18 U.S. C. §2333(a) as to PLAINTIFF Roger Fry and interest thereon;

5. Costs of this suit, including reasonable attorneys' fees set by this Honorable Court; and,

6. Any further relief which the Court deems just and proper.

Respectfully submitted,

*[signature]*

Andrew C. Hall
Florida Bar # 111480
Penthouse, 1428 Brickell Avenue
Miami, Florida 33131
(305) 374-5030
(305) 374-5033-fax

| | |
|---|---|
| James Cooper-Hill | Nelson M. Jones, III |
| Texas Bar # 047893000 | D.C. Bar # 320266 |
| 1723 Cherry Street | 440 Louisiana, Suite 625 |
| Houston, TX 77002 | Houston, Texas 77002 |
| (713) 224-5323 | (713) 224-5323 |
| (713) 224-8525- fax | (713) 224-8525-fax |

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing was sent on September 25th, 2002, via fax and U.S. mail to: Arman Dabiri, Law Offices of Arman Dabiri & Associates, PLLC, 1701 Pennsylvania Avenue NW, Suite 300, Washington, D.C. 20006

*[signature]*

Andrew C. Hall
Florida Bar # 111480