IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL H. PRICE and )
ROGER K. FREY, )
 )
     Plaintiffs, )
 )
v. )     Civil Action  No. 97-975 (RCL)
 )
SOCIALIST PEOPLE'S LIBYAN )
ARAB JAMAHIRIYA, )
 )
     Defendant. )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this case, defendant Socialist People's Libyan Arab Jamahiriya ("Libya") stands accused

of physically and mentally torturing plaintiffs Michael H. Price and Roger K. Frey during a 105-day

detention in 1980.  Since plaintiffs filed this case in 1997, Libya has vigorously litigated several

motions to dismiss in this Court and the Court of Appeals.  See Price v. Socialist People's Libyan

Arab Jamahiriya, 389 F.3d 192, 194-96 (D.C. Cir. 2004).  After failing to have plaintiffs' complaint

dismissed in its entirety, Libya announced that it would no longer participate in the case.   On May

26, 2005, the Court ordered that the clerk enter default against Libya and scheduled a trial for July

1, 2005 at which plaintiffs could present evidence supporting the entry of default judgment pursuant

to 28 U.S.C. § 1608(e).

At trial, plaintiffs Price and Frey testified and plaintiffs introduced into evidence the

depositions of Dr. Norman Decker, M.D., a board certified psychiatrist, and Dr. Barry Wilbratte,

Ph.D., an economist, along with various other documents.  Based on the evidence presented, the

Court makes the following findings of fact and conclusions of law and will, consistent with them, enter default judgment in favor of plaintiffs and against Libya.

## FINDINGS OF FACT

1.      At the time of the events at issue in this case, defendant Libya was designated as a state sponsor of terrorism. See 31 C.F.R. § 596.201 (2001); Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82 (D.C. Cir. 2002).

2.      Plaintiff Michael H. Price was born on September 28, 1948.  Mr. Price is a citizen of the United States.  Presently Mr. Price resides in Houston, Texas.  Mr. Price graduated from the Illinois Institute of Technology, earning a Bachelor's Degree in Operations Research in 1973 and a Master's Degree in Operations Research in 1974.  In 1975, Mr. Price earned a Master's Degree in Business Administration from the University of Chicago.  The following year, he earned a Master's Degree in Economics from the London School of Economics.  In 1982, Mr. Price earned a Master's Degree in Petroleum Engineering from Tulane University.

3.      Plaintiff Roger K. Frey was born on June 16, 1947.  Mr. Frey is a citizen of the United States. Mr. Frey currently lives in Del Mar, California.  Mr. Frey earned a Bachelor's of Arts Degree from Dartmouth College in 1969.  In 1973 and 1974, Mr. Frey attended the University of Chicago, from which he received a Master's in Business Administration, as well as the Universite de Louvain, Belgium, from which he earned a degree in Finance and Economics. In 1982, Mr. Frey earned a Master's Degree in Petroleum Engineering from Tulane University.

**Plaintiffs' Detention in Libya**

4.    In February of 1980, plaintiffs were living in Tripoli, Libya.  Each had recently become an employee of Oasis Oil Company of Libya, Inc.  Mr. Price was employed as a Senior Engineer.  Mr. Frey was employed as a Project Analyst.

5.    Sometime in February of 1980, plaintiffs were taking photographs of construction projects in the area when policemen wearing plain clothes informed plaintiffs that their photography was illegal, led plaintiffs to the police station, and held plaintiffs' passports.

6.    On March 19, 1980, plaintiffs were told that they could retrieve their passports at the Central Station.  Plaintiffs went to the station, but were not given their passports.  Instead, plaintiffs were detained, and plaintiffs remained incarcerated by Libya for the next 105 days.

7.    During the 105 days of incarceration, plaintiffs were mentally and physically tortured by agents of the Libyan government acting in their official capacities.  The torture inflicted upon plaintiffs was systematic and severe.  The torture, at first, was directed at forcing plaintiffs to confess that they were covert employees of the CIA and were acting as spies for the United States.  After plaintiffs were forced to confess, the torture continued in an effort to coerce plaintiffs to disclose the names of others with whom they were allegedly acting in concert.

8.    Throughout their incarceration, plaintiffs were continuously[1] and systematically beaten,

---

[1]In this litigation, plaintiffs have characterized their beatings as continuous, systematic, and severe and have described beatings that took place throughout their 105-day ordeal.  In plaintiffs' separate 1981 lawsuit against Oasis Oil, plaintiffs' employer at the time, plaintiffs each gave deposition testimony that indicates that their beatings were of a more discrete nature and largely confined to the latter portion of their captivity.  The apparent discrepancy was the subject of one of Libya's motions to dismiss.  See Price v. Socialist People's Libyan Arab Jamahiriya, 274 F. Supp. 2d 20, 25-26 (D.D.C. 2004). The Court now credits plaintiffs' recent affidavits and trial testimony and credits the diagnosis of Dr. Decker – a board certified psychiatrist who has been

clubbed and kicked by agents of Libya.  Plaintiffs suffered blows to their heads, torsos, and feet.  Libyan agents beat plaintiffs using truncheons and sticks, as well as their hands.  Each plaintiff sustained significant, permanent injuries from such beatings, as will be fully discussed.

9.      On the morning of March 20, 1980, after spending their first night of incarceration in the police station, plaintiffs were transported to the offices of the Ministry of Justice.  There, they were interrogated by a revolutionary prosecutor.  During this interrogation, plaintiffs were accused of spying for the CIA and were directed to sign Arabic documents which were identified as pre-prepared confessions.  Plaintiffs refused to sign the proffered confessions.  When Libyan officials persisted, plaintiffs still refused to confess.   The interrogators informed plaintiffs that they would be prosecuted and convicted as spies and then held as hostages that Libya might barter in exchange for Libyan agents whom Libya expected to be arrested at some later point in the United States for assassinating expatriate Libyan dissidents.  (Frey Aff. ¶ 6.)  Libyan officials also advised plaintiffs that they were being held in order to bolster that nation's political alliances with Iran and to allow Libya to gain political leverage worldwide.  (Frey Aff. ¶ 8.)

10.     After initial interrogations, plaintiffs were taken to Gedeidah Prison.  Plaintiffs were told that Gedeidah was a prison for dissidents.  While incarcerated at Gedeidah Prison, plaintiffs were

_____

on the Baylor College of Medicine faculty since 1974 – who explains that plaintiffs' omission of events in the earlier litigation is consistent with a form of amnesia associated with Post Traumatic Stress Disorder, from which both plaintiffs continue to suffer. (See Decker Dep. at 5, 73.)  The Court has no reason to reject this opinion of the plainitiffs' respected medical expert, who is a leading authority on PTSD.

confined with up to ten prisoners in cells no larger than twenty by fifteen feet.  They slept on mattresses that wreaked of urine.  Libya deprived plaintiffs of adequate food.  They had to depend on the kindness of other inmates who were fortunate to have family or friends deliver food, as is the custom in Libya.

11.      A few days into their incarceration, a junior prosecutor visited plaintiffs at the prison.  He presented plaintiffs with the Arabic confessions and asked plaintiffs to sign them.  Plaintiffs again requested a translation.  Plaintiffs' request was refused and plaintiffs refused to sign.  At that point, the junior prosecutor became very angry and threatened that he would teach plaintiffs a lesson.  That night, prison guards pulled  plaintiffs from their cell and brought them to a common area with latrines. The latrines were  in poor condition, and during the day, they would clog with human excrement.  The guards forced plaintiffs to clean the latrines.  Plaintiffs used their bare hands, coat hangars for scraping, and a black garbage bag for collection.   From time to time, a guard would defecate while plaintiffs labored and plaintiffs would have to clean the new excrement on the spot.  After cleaning the toilets, plaintiffs were denied access to water or other means to remove feces from their bodies and clothes.   Plaintiffs would use Price's nail clipper, which was not taken from him, to keep their nails as short as possible.  These forced clearings continued nightly for two weeks.

12.      On or about April 7, plaintiffs were visited in prison by a person claiming to be their attorney who informed them that if they chose not to confess to espionage, they would face a lengthy prison sentence or the death penalty.  Again, plaintiffs refused to confess.

17.      A few days later, Mr. Price was visited in prison by a revolutionary prosecutor who handed Mr. Price a forged telegram, purportedly from the U.S. State Department, indicating that his

5

mother had passed away.  The prosecutor advised Mr. Price that if he confessed that he had

a relationship with the CIA, he would be permitted to attend his mother's funeral.  In reality,

Mr. Price's mother had not passed away, but was very much alive and living in Chicago. Mr.

Price did not confess.

13.     During their incarceration, plaintiffs constantly were awakened at night by the sounds of

screams, doors slamming, and of other prisoners being beaten or shot.

14.     Between April 13 and April 30, 1980, in a continued effort to induce them to confess,

plaintiffs were pulled from nighttime lockup on three separate occasions.  Each time, Messrs.

Price and Frey were bound, taped to chairs, and forced to watch as other prisoners were

beaten and killed by members of the Secret Police.  Mr.  Frey needed to close his eyes, but

Mr. Price kept his eyes open.

15.     The first victim, a Tunisian prisoner, had been a friend of Mr. Frey.  Guards used a hammer

to break the Tunisian's toes, fingers, feet, and arms.  The beating took some 10 minutes and

was systematic.  Mr. Price recalls that it sounded like an animal being injured: like  the shrill

cry of a dog hit by a car.  The Tunisian lay unconscious and blood was all around: he

appeared dead.  During this incident, the prison captain addressed plaintiffs as "CIA" and

threatened that they would be next if they did not confess.

16.     The second victim, a Libyan journalist, was beaten because he endeavored to give plaintiffs

assistance in coping with their incarceration.    The beating was less severe than the

Tunisian's.  Again, plaintiffs were told they would be next.

17.     The third victim, Mahmood Banoon, was beaten because he dared to share food, given him

by friends and relatives, with plaintiffs.  Prison guards broke every bone is his body with a

6

rubber truncheon and then put a hammer through his skull.  Banoon died.

18.     Following these three beatings, on or about April 30, plaintiffs were taken to a municipal building and interrogated by three prosecutors.  During this interrogation, the Libyan Secretary of Justice was present.  Plaintiffs were told by one prosecutor that they had one final chance to confess to being spies.  They believed that If they refused to sign the written confessions, they would suffer the consequences similar to those that befell the three prisoners whose physical torture plaintiffs were forced to witness.

19.     Fearing for their lives, plaintiffs signed several documents without the benefit of an English translation.

20.     The Libyan officials, pleased by the confessions for a brief minute, quickly reestablished a confrontational posture.  The officials then demanded that plaintiffs divulge the names of co-conspirators in Libya who had aided them.  As Libya sought to elicit names, the torture of plaintiffs continued.

21.     After the meeting at which plaintiffs confessed, Libyan agents blindfolded plaintiffs, and transported them to in a white Peugot to an undisclosed location.  After leaving plaintiffs inside the car, windows closed, in the sweltering Libyan heat for one-half hour, plaintiffs passed out and came to in separate, solitary prison cells.  These cells were not at Gedeidah. They lacked ventilation and toilet facilities.  Plaintiffs were kept in these cells for seven days, during which they were severely and systematically beaten.

22.     Mr. Price was beaten in his cell on a routine basis – two to three times a day.  Once, three people tipped him upside down and lashed his feet with iron barbs.  On other occasions he was beaten on his head, which has since caused him permanent hearing deficit.  He was

subjected to mock executions on three occasions.  The Libyan agent would place a pistol in his mouth and pull the trigger – but the guns were not loaded.  During these events, Price would hear his torturers ask, "who Libyans?," which he took to be a demand for names of co-conspirators.

23.   Mr. Frey also suffered abuse.  He was hit with truncheons every other day, but feared beatings each time a guard would come to his cell.  To minimize the damage of the beatings, Frey would try to lie on his mattress so he could cover his head.  He was subjected to mock executions on two occasions.  Frey heard his tortures say, "you say," which he took to be a demand for names of co-conspirators.

24.   After seven days, plaintiffs were taken back to Gedeidah Prison.

25.   Around this time, plaintiffs gained access to a short-wave radio.  Price and Frey heard international news reports stating that they were being held on charges of espionage. Plaintiffs were told by fellow prisoners that Libyan officials, angered by such worldwide exposure, would most certainly kill plaintiffs.  Exacerbating such fears, Libyan guards entered plaintiffs' cells on several occasions and subjected them to mock executions by placing rifle barrels against their temples and dry firing the rifles.  The combination of physical abuse, mock executions, and torture of others which plaintiffs were forced to witness led plaintiffs to believe their own deaths were imminent. Plaintiffs believed that their chances of surviving their incarceration were virtually nil.

26.    On or about June 3, plaintiffs were transported to Political Section 4 of the Tripoli Central Prison, a prison run by the Libyan Army.  Following plaintiffs' transfer to Central Prison, the incidents of torture became more frequent and more severe.

27.   Plaintiffs were forced to lie in their beds and cover themselves with wool blankets even though the temperature was 120 degrees inside the prison.

28.   They were often required to run along a long prison corridor, or to run in place while waiting in the food line, and were taken from the food line to be beaten with truncheons.  Prisoners were required to look downwards.  When Frey looked up on one occasion, he was taken to a triangular courtyard where the prison head demanded information and, getting none, a martial arts experts attacked Frey, delivering several blows to Frey's head.

29.   On another occasion, plaintiffs were taken to an exercise area where they were placed just outside the reach of numerous attack dogs chained to spikes, and were told by Libyan authorities that they would remain chained and in peril unless they divulged the identities of those Libyans who purportedly assisted plaintiffs in their spying operations.  When plaintiffs refused, Libyan agents began inciting the dogs to become agitated, and to bark and snarl at plaintiffs, by tossing hunks of meat into the area.  This caused plaintiffs to fear for their physical safety in the event that the dogs were able to break their chains or loosen the stakes restraining them.

30.   Another aspect of plaintiffs' torture was the denial of medical care.  This occurred at both the Gedeidah and Central Prisons.

31.   Plaintiffs sustained a number of debilitating injuries and illnesses as a result of their physical abuse, including hearing loss, tinnitus, nerve damage, infections and blood clots, and received no medical attention for these problems.

32.   In addition, Mr. Price suffered from multiple bouts of pneumonia, tracheal bronchitis and urinary tract infections.   At various points, Mr. Price would cough up blood.  At other

points, he would be unable to urinate for significant periods of time.  Mr. Price was left with a self-created remedy: he inserted his fingers into his rectum and massaged his prostrate to permit urination.

33.   Mr. Frey developed serious medical problems during his incarceration due to the physical abuse inflicted upon him.  After one incident in which prison guards beat Mr. Frey in the area of his kidneys, Mr. Frey began to urinate blood.

34.   Both plaintiffs experienced significant weight loss while incarcerated, losing upwards of twenty pounds each.

35.   Although plaintiffs begged for medical treatment, they were advised that such treatment would be denied, first until they confessed their status as CIA spies, and then until they provided the names of their supposed Libyan co-conspirators.

36.   While at Central Prison, one of Mr. Price's cellmates directed him to an area where old medicines were discarded.  At the time, Mr. Price was suffering from a fever, shortness of breath and an inability to urinate.  Given that he was denied even the most basic medical care, Mr. Price was left with no choice but to randomly select and consume various medications without knowing what they were, what effect they had or to what extent they would help him.

37.   On or about July 3, 1980, plaintiffs were once again transported to the municipal building.  A court conducted a hearing and plaintiffs were acquitted of all charges.  (Exh. 9.)  Essentially, the Libyan judge concluded there was no evidence that plaintiffs' photo taking activities were anything but innocent.  Plaintiffs were released from prison.

38.   Upon their release, plaintiffs were advised by Libyan officials that they would not be

permitted to leave the country, both because prosecutors were in the midst of appealing

plaintiffs' acquittal, and because plaintiffs' physical appearance – which reflected the torture

inflicted upon them – would need to improve before plaintiffs would be granted the right to

leave.

39.     During the last week of July 1980, plaintiffs were forced to meet with Revolutionary

Prosecutors on two occasions.  During the first meeting, plaintiffs were advised that due to

the intervention of General Khadafi, their case had been terminated.  During the final

meeting, plaintiffs were advised to forget their experiences while incarcerated in Libya.

40.     On August 9, 1980, plaintiffs were allowed to leave Libya and return to the United States.


**Effects of the Torture**

41.     While plaintiffs' physical incarceration ended some twenty-five years ago, the effects did not.

As discussed below, the harm caused to each plaintiff was permanent and debilitating.


*Emotional Harms*

42.     Based upon the deposition testimony and reports of Dr. Norman Decker, a board certified

psychiatrist, and the report of Dr. Richard C.W. Hall, this Court finds that plaintiffs Price and

Frey suffer from Post-Traumatic Stress Disorder ("PTSD")  and from Personality Disorder

with schizoid and avoidant features which were proximately caused by the treatment inflicted

upon plaintiffs by Libya.

43.     As Dr. Decker stated, one symptom of PTSD, from which both plaintiffs suffer, is amnesia.

 In the months and years immediately following their release, plaintiffs were in a state of

shock, and were unable to allow themselves to recall certain aspects of their torture given the extent of the trauma involved.  Over time, however, their memory recovered.  (Decker Dep. at 73.)

44.  In the twenty-five years since his imprisonment and torture, Mr. Price has experienced an ongoing tension between the impulse to relive his experiences and the impulse to avoid thinking about them.  Mr. Price relives his experiences typically in the form of terrifying, realistic nightmares in which he imagines himself in prison.  Mr. Price often has several nightmares per night, from which he awakens violently, drenched in perspiration.  Unable to calm down, Mr. Price lies in bed for hours on end, and suffers extreme exhaustion as a result.

45.  Mr. Price also relives his experiences while awake, in the form of flashbacks.  Such flashbacks often occur after watching a television program or film depicting war or prison scenes.  Unable to calm himself down after a flashback, Mr. Price often withdraws to an empty room for hours on end.

46.  Mr. Price has difficulty discussing his experience.  After some therapy sessions with Dr. Decker, Mr. Price would "get lost in himself" and would need 3-4 hours to recover before he could get himself home.  The stress involved in relating his time in Libya causes him to perspire.  When initially discussing this suit with his lawyers, he sweated through his suit, leaving a puddle on the conference table at which he was seated.

47.  As a result of his ordeal and the resulting emotional damage caused thereby, Mr. Price also suffers disabilities regarding his personal relationships.  Upon his release from captivity, Mr. Price returned to his wife of one year.  However, he was withdrawn and emotionally absent,

suffering extreme feelings of vulnerability and a fear of intimacy.  As a result, Mr. Price's marriage failed.

48.     Mr. Price remarried.  However, the mistreatment inflicted upon Mr. Price by Libya caused and continues to cause him to suffer a fear of intimacy and vulnerability.  Based upon these problems,  Mr. Price and his wife separated several times over the years and have lived in separate residences.  The events in Libya have resulted in the fact that Mr. Price was unable to have a sexual relationship with his wife for a number of years.

49.     Mr. Price suffers occupational disabilities as a result of his ordeal.  While he has held a number of responsible positions in the oil industry, his career has been altered and curtailed by the impact of the treatment inflicted upon him by Libya.  He is unable to work within the confines of an organization: he requires downtime and goes through days where he simply cannot function.  Mr. Price cannot work or travel to the Middle East.  He is afraid of traveling outside the United States and has not left the United States since returning from Libya.

50.     Mr. Price has also suffered several bouts of severe anxiety, suppressed anger and depression.  Such anger has a tendency to surface rather suddenly and unexpectedly.  On one occasion, Mr. Price was honked at by a driver while crossing the street on foot.  Mr. Price became enraged, and proceeded to kick the panels of the driver's Porsche while the driver cowered inside.

51.     Mr. Price constantly feels guilty about having survived his ordeal while so many of his fellow prisoners did not.  At one point, Mr. Price was suicidal.

52.     In the years following his ordeal, Mr. Price's level of functionality, on a scale of zero to 100,

was "fifty," meaning that he had serious symptoms such as suicidal ideation, obsessive rituals and serious impairment in social or work settings, and was on the verge of hospitalization. Presently, having the benefit of several years of therapy, Mr. Price's level of functionality has reached "sixty," meaning that he still has marked difficulty in social, occupational or school functioning, has few friends, and his conflicts with co-workers. Mr. Price has incurred $14,221.85 in bills for treatment with Dr. Decker. (Decker Dep.; Exh. 15.)

53.  Even with therapy, Mr. Price will not improve. He will be symptomatic for the rest of his life, and will likely require therapy. But because of the inability to be precise as to the amount of future therapy required, plaintiffs have not requested an award for future psychiatric care.

54.  Mr. Frey frequently relives his experiences through nightmares and flashbacks. To avoid such episodes, Mr. Frey carefully controls what he reads in the newspaper or watches on television. Mr. Frey has avoided therapy because he feels it will evoke painful emotions.

55.  Mr. Frey was able to form intimate, lasting relationships (including sexual ones) before his incarceration. As a result of Libya's treatment of Mr. Frey, the opposite is now true. He has avoided relationships at all costs since his release. As Dr. Decker testified, Mr. Frey's "whole life is hiding." (Decker Dep. at 90.) Following his incarceration, Mr. Frey withdrew from his friendships, in large part because he could not bear to discuss his ordeal. Shortly after the attacks of September 11, 2001, Mr. Frey moved to a small community in California, where he knew no one, and where no one knew of his past. Mr. Frey has very few friends, no romantic relationships, and no family. As soon as he feels a relationship may turn

intimate, he runs away.  As a result, Mr. Frey often suffers extreme loneliness.

56.   Mr. Frey's incarceration has had a negative impact on his career.  Mr. Frey was never able to travel to an Arab country.  He declined supervisory positions, fearing that they would give rise to interpersonal relationships too difficult to bear.  Instead, Mr. Frey accepted research positions which had more limited salaries and advancement potential.  Following the terrorist attacks on the World Trade Center on September 11, 2001, Mr. Frey suffered extreme anxiety which rendered him unable to work.  He therefore retired permanently.

57.   Before his incarceration, Mr. Frey was a confident man with a positive outlook.  Since then, however, he has become depressed and anxious.  At various points, Mr. Frey was a self-described basket case, wholly unable to function.  He suffers extreme guilt and shame over his ordeal, saddened that he survived while others in his situation did not.  Further, Mr. Frey believes himself wholly incapable of handling any stressful situations that may arise.

58.   Given his extremely avoidant lifestyle and inability to forge any kind of relationships, Mr. Frey's functionality level is "fifty," barely able to maintain life outside of a hospital setting.

*Physical Harms*

59.   Plaintiffs sustained significant, permanent physical injuries as a result of the physical beatings and other mistreatment they suffered while incarcerated.  (Exh. 17; Exh. 18.)

60.   As a direct result of beatings to his head and face, Mr. Price suffers from nerve damage and tinnitus (or ringing of the ears).  This has caused diminished hearing, particularly in Mr. Price's right ear.

61.   Mr. Price suffers from Chronic Inflammatory Demyelinating Polyneuropathy ("CIDP"), the

symptoms of which are numbness, tingling and pain on the bottoms of his feet, causing severe pain when he walks.  Mr. Price contracted CIDP as a direct result of the beatings Mr. Price sustained to his legs and feat while incarcerated.  Although Mr. Price receives treatment in the form of intravenous immunoglobulin, this condition will ultimately follow a progressive downhill course, leading to severe functional disabilities.

62.   That portion of Mr. Price's brain responsible for initiating self-calming behaviors has atrophied, thereby impairing his ability to calm himself.  In an effort to keep himself calm, Mr. Price has resorted to feeding himself excessively,  regardless of appetite or satiation.  As a result, Mr. Price weighs 270 pounds, some fifty to sixty pounds more than he weighed prior to 1980.  This significant weight gain poses a health hazard, contributing to his high blood pressure and elevated serum lipids, both of which require medication.

63.   The beatings Mr. Frey sustained to his head and ears caused tinnitus and bilateral hearing loss.  Although the tinnitus abated within six months of his release, Mr. Frey still suffers from diminished hearing.

64.   During his incarceration, Mr. Frey lost between 20 and 30 pounds, and remained very thin until only two years ago when he finally regained the weight.

*Economic Losses*

65.   Plaintiffs have offered deposition testimony and reports from economist Dr. Barry Wilbratte concerning alleged past and future wages lost by plaintiffs as a result of their ordeal.   Dr. Wilbratte estimates that, before addition of inflation or interest, Mr. Frey's past lost wages come to $3,649,033 and future lost wages comes to $2,167,587.  For Mr. Price, the numbers

are $3,246,831 in past lost wages and $1,673,231 is future lost wages.  (Exh. 19.)

66.    In 1979 and 1980, Mr. Price's salary was about $63,000 and $65,000, respectively.  For the next five years – right after his captivity – he made significantly less.  However, in 1986, he made over $85,000 and from 1987 up to 1997 he brought in a salary of over $100,000 a year.  (Exh. 19.)  From 1997 through 2001, his salary ranged from $159,259 to $284,121, but in 2002, it was $62,097.  (Exh. 20.)

67.    Similarly, Mr. Frey had a salary of about $68,000 in 1979 and $66,000 in 1980.  Though his salary took a significant hit in 1981 and 1982, by 1983 his salary was $64,727.  From that point, his salary began a steady upward climb into the six figures where it remained, with one exception, from 1989 to 1998. (Exh. 19; Exh. 21.)  In 1999 and 2000, his salary was approximately $89,000, in 2001 it was $152,833, and in 2002 it was$60,711.  (Exh. 21.)

68.    While Mr. Price has continued to work full-time, Mr. Frey abruptly stopped full-time work after the traumatic events of September 11, 2001.  Mr. Frey, based on statistical evidence, would have been expected to work an additional 12 years beyond that date.  (Exh. 5.)


## CONCLUSIONS OF LAW


I.    **Legal Standard for FSIA Default Judgment**

The Foreign Sovereign Immunities Act provides that "[n]o judgment by default shall be entered by a court of the United States or of a State against a foreign state . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  "In evaluating the plaintiffs' proof, the court may 'accept as true the plaintiffs' uncontroverted

evidence.'"   Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 268 (D.D.C. 2003)

(quoting Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 100 (D.D.C. 2000)). Plaintiffs'

evidence may take the form of sworn affidavits.  Id. (citing Weinstein v. Islamic Republic of Iran,

184 F. Supp. 2d 13, 19 (D.D.C. 2002)).


## II.   Jurisdiction

The Foreign Sovereign Immunities Act provides the sole basis for asserting jurisdiction over

foreign sovereigns in the United States.  See Argentine Republic v. Amerada Hess Shipping Corp.,

488 U.S. 428, 434 (1989).  The "state-sponsored terrorism" exception provides that a foreign

sovereign will not be immune to suit in U.S. courts where:

> money damages are sought against a foreign state for personal injury or death that
> was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage
> taking, or the provision of material support or resources (as defined in section 2339A
> of title 18) for such an act if such act or provision of material support is engaged in
> by an official, employee, or agent of such foreign state while acting within the scope
> of his or her office, employment, or agency.

28 U.S.C. § 1605(a)(7).  To subject a foreign sovereign to suit under section 1605(a)(7), a plaintiff

must demonstrate: (1) that the foreign sovereign was designated by the State Department as a "state

sponsor of terrorism;" (2) that the foreign sovereign was afforded a reasonable opportunity to

arbitrate any claims based on acts that occurred within that state; (3) that the victim was a U.S.

national at the time the acts took place; and (4) that the foreign sovereign  engaged in conduct that

falls within the ambit of the statute, in this case, torture.

Plaintiffs have satisfied each of the requirements set forth above.  Libya has been designated

a state sponsor of terrorism.  See 31 C.F.R. § 596.201 (2001); Price v. Socialist People's Libyan

Arab Jamahiriya, 294 F.3d 82 (D.C. Cir. 2002).  Libya was provided an opportunity to arbitrate the claims at issue here: an offer to arbitrate was attached to the original complaint served on Libya in 1997. (Pl. Exh. 3.)  Both plaintiffs were American citizens at the time of their incarceration, and remain so today.  (Price Aff. ¶ 2; Frey Aff. ¶ 2.)   The severe, coercive mistreatment to which they were subjected during their incarceration falls squarely within the definition of torture.  Price v. Socialist People's Libyan Arab Jamahiriya, 274 F. Supp. 2d 20, 25 (D.D.C. 2003).  Accordingly, the Court has subject matter jurisdiction over this action.

Personal jurisdiction over a non-immune foreign sovereign exists so long as service of process has been made under section 1608 of the FSIA.  Stern v. Islamic Republic of Iran, 271 F. Supp. 2d 286, 298 (D.D.C. 2003).  Such service has been made, and the court has in personam jurisdiction over Libya.

III.     **Liability**

A.     **Proper Causes of Action Under the FSIA**

Once a foreign state's immunity has been lifted under section 1605 and jurisdiction is proper, section 1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.  Section 1606 acts as a "pass through" to substantive causes of actions against private individuals that may exist in federal, state, or international law.  Dammerll v. Islamic Republic of Iran, No. 01-2224, 2005 U.S. Dist LEXIS 5343, at *27-32 (D.D.C. Mar. 29, 2005).   Our Court of Appeals has never had the opportunity to explicitly sanction any particular cause of action as a basis of liability for a state that has lost immunity under 1605(a)(7).  Collett v. Socialist Peoples' Libyan Arab Jamahiriya, 362 F.

Supp. 2d 230, 238 n.5 (D.D.C. 2005).[2]  However, the Supreme Court makes clear that state law can provide the basis for liability.  When a state is not immune from suit, and "state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances."  First Nat. City Bank v. Banco Para El Comercio Exterior De Cuba, 462 U.S. 611, 622 n.11 (1983); see also Brink's Ltd. v. South African Airways, 93 F.3d 1022, 1030-32 (2d Cir. 1996) (noting that "state law generally controls in FSIA cases").  Recent opinions of this district court hold foreign states liable for terrorist activity on state law grounds.  Dammerell, 2005 U.S. Dist LEXIS 5343, at *55; Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 114 (D.D.C. 2005).

State law may provide a basis for liability in this case.  For this to be, some state law must be victorious under the choice of law principles of the forum, here, the District of Columbia.  Dammerell, 2005 U.S. Dist LEXIS 5343, at *57.  Of course, the victorious state law must then provide a cause of action against private individuals for the kind of acts that defendant allegedly committed.  See 28 U.S.C. § 1606.  Under D.C. choice of law principles, courts employ a refined government interest analysis under which courts "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law

---

[2]The Court of Appeals, however, has held that generic common law torts and certain federal statutes cannot provide a basis for liability, e.g. Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1035 (D.C. Cir. 2004) (holding that neither section 1605(a)(7) of the FSIA nor the Flatow Amendment, either alone or in tandem, creates a cause of action against foreign terrorist states); Acree v. Republic of Iraq, 370 F.3d 41, 59 (D.C. Cir. 2004) (generic common l aw), and has expressed disdain for federal common law as a basis for liability, Bettis v. Islamic Republic of Iran, 315 F.3d 325, 333 (D.C. Cir. 2003) (noting that section 1606 only empowers judges to "find the relevant law, not to make it").

applied to the facts of the case under review."   Dammerell, 2005 U.S. Dist LEXIS 5343, at *57-58

(citing Hercules & Co. v. Shama Rest. Corp., 566 A.2d 31, 41 (D.C. 1989)).   To support its

application of state law, Dammerell cited the "paramount" interest of a domiciliary state in having

its own law provide relief to its residents and the interests of the United States in having domestic

law, as opposed to foreign law, apply in cases arising from state-sponsored terrorist activity. Id. at

*59-60, *63-64 (citing Restatement (Third) of Foreign Relations Law § 402(3) (1987)).   Like the

embassy bombings that gave rise to the claims in Dammerell, the state-sponsored torturing of

plaintiffs – directed at coercing plaintiffs to confess an involvement with CIA activities and done

with the hope of having plaintiffs as bargaining chips should America capture Libyan assassins – is

the kind of harm that the United States has a state interest in discouraging.   Given the strong United

States interest in addition to strong interest of plaintiffs' home states in providing legal relief to their

residents, the Court concludes that Texas law should govern the tort claims of Price and California

law should govern the tort claims of Frey.

Plaintiffs each allege common law assault, battery, and intentional infliction of emotional

distress, each of which is a tort for which private individuals may face liability.  The court's next task

is to determine whether plaintiffs have shown liability and damages for these claims under the laws

of Texas and California.[3]

---

[3]Plaintiffs assert other claims besides state law claims in their Amended Complaint; however,
because the Court concludes that plaintiffs may recover under state law, the Court need not
address other argued-for grounds of liability, such as the Flatow Amendment and the Torture
Victim Protection Act  working through section 1606.  Compare Dammarell, 2005 U.S. Dist
LEXIS 5343, with Dodge v. Islamic Republic of Iran, No. 03-252, slip op. (D.D.C. Aug. 25,
2004).

### B.      Assault and Battery

Under both Texas and California law, a plaintiff seeking to recover for assault must prove: (1) that the defendant intended to cause a harmful or offensive contact, or the imminent apprehension of such contact, and (2) that plaintiff was put in imminent apprehension of such contact.   Austin v. Terhune, 367 F.3d 1167, 1172 (9th Cir. 2004);  Truman v. United States, 26 F.3d 592, 596 (5th Cir. 1994).  Similarly, both states define battery as any intentional, harmful and offensive contact with the person of another.  Hutchison v. Brookshire Bros., Inc., 225 F. Supp. 2d 719, 730 (E.D. Tex. 2002); Garrett v. City of Almeda, No. 94-1134, 1995 WL 129239, at *5 (N.D. Cal. Mar. 22, 1995) (citing Ashcraft v. King, 228 Cal. App. 3d 604 (1991)).

Based on the evidence submitted, plaintiffs' claims of assault and battery have been established.  Price and Frey were beaten repeatedly with truncheons, sticks and bare fists, suffering blows to their heads, face, torsos and feet.  When they were not being beaten, they were threatened with bodily harm and death if they failed to confess to spying and name their so-called Libyan co-conspirators.  Accordingly, plaintiffs are entitled to recover for assault and battery under Texas and California law.

### C.      Intentional Infliction of Emotional Distress

Both Texas and California recognize the tort of intentional infliction of emotional distress. Twyman v. Twyman, 855 S.W.2d 619, 621 (Tex. 1993); State Rubbish Collectors Ass'n v. Siliznoff, 240 P.2d 282, 285 (Cal. 1952).  Section 46(1) of the Restatement (Second) of Torts provides that "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other

results from it, for such bodily harm." Libya, by its extreme and outrageous conduct toward plaintiffs, has intentionally inflicted emotional distress upon plaintiffs and is responsible for its misconduct.

IV. **Damages**

As a result of Libya's wrongful conduct, plaintiffs were subjected to both mental and physical torture by Libya and its agents throughout their incarceration, the effects of which have been felt by plaintiffs for the last 25 years and will be felt by plaintiffs for the rest of their lives.[4] Because section 1606 of the FSIA provides that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606, plaintiffs are entitled to the typical array of compensatory damages that may be awarded against tortfeasors in Texas and California, including, for example, pain and suffering and lost past and future wages, . See 5-80 Texas Torts and Remedies § 80.01 (summarizing available damage awards); 4-50 California Torts § 50.02 (same). Punitive damages are not available against foreign states. 28 U.S.C. § 1606 (stating that "a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages"); Collett, 362 F. Supp. 2d at 243 (D.D.C. 2005). A "FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." Hill v. Republic of Iraq, 328 F.3d 680, 683-84 (D.C. Cir. 2003). This means that "to recover damages a FSIA plaintiff must prove that the projected consequences are 'reasonably certain' (i.e., more likely than

---

[4] According to the Centers for Disease Control, Mr. Price's life expectancy is an additional 23.5 years, whereas Mr. Frey's life expectancy is an additional 22.7 years. *See* Elizabeth Anas, Centers for Disease Control, 53 National Vital Statistics Reports no. 6 (Nov. 10, 2004).

not) to occur, and must prove the amount of damages by a 'reasonable estimate.'" Id. at 684.

A.    **Pain and Suffering During Captivity**

The evidence of plaintiffs' pain and suffering, both physical and mental, over the 105 days of captivity is extensive and shocking.  Putting a number on these kinds of harms can be difficult. Fortunately for this Court, precedence guides its calculations.  In many cases of prolonged and abusive captivity, plaintiffs are awarded approximately $10,000 per day for the pain and suffering they experienced while captive.  Sutherland v. Islamic Republic of Iran, 151 F. Supp. 2d 27, 51 (D.D.C. 2001) (awarding plaintiff some $23 million for 2,354 days of captivity during which he endured harms spanning  "lack of hygiene to loneliness to severe beatings"); Daliberti v. Islamic Republic of Iraq, 146 F. Supp. 2d 19, 26 (D.D.C.2001); Anderson v. Islamic Republic of Iran, 90 F. Supp. 2d 107, 113-14 (D.D.C. 2000); Dodge v. Islamic Republic of Iran, No. 03-252, slip op. (D.D.C. Aug. 25, 2004) (noting appropriateness of a $10,000 per day figure for hostages that had endured such harms as being forced to lie in their own waste and being forced to watch the torture and death of fellow captives, but awarding $8000 per day to plaintiff suffering relatively less severe harms); cf. Cronin v. Islamic Republic of Iran, 238 F. Supp. 2d 222, 234-35 (D.D.C. 2002) ("This formula has not been applied in every hostage taking case brought under the FSIA, however. In several cases, the Court has adjusted the amount of the per diem award based on the severity of the maltreatment suffered by the plaintiff, while in other cases the Court has not applied a per diem approach at all because of the brevity of the captivity."); Acree v. Islamic Republic of Iraq, 271 F. Supp. 2d 179, 219-20 (D.D.C. 2003) (awarding lump sums of $20 million, $15 million, or $10 million for the pain and suffering endured during captivity by various U.S. soldiers captured and

brutally tortured by Iraq for periods of less than 50 days).

Plaintiffs ask the Court to follow the per diem approach of <u>Sutherland</u> and <u>Anderson</u>.  Given this, and given that the horrors that plaintiffs suffered are, sadly, much like the horrors endured by the plaintiff in <u>Sutherland</u> who received $10,000 per day, <u>see</u> <u>Sutherland</u>, 151 F. Supp. 2d 33-36, the Court concludes that each plaintiff in this case is entitled to $1,050,000 for the pain and suffering they endured throughout their 105 days of captivity.

Plaintiffs seek pre-judgment interest on this amount.  This request will be denied.  "Whether pre-judgment interest is to be awarded is subject to the discretion of the court and equitable considerations."  <u>Motion Picture Ass'n of Amer., Inc. v. Oman</u>, 969 F.2d 1154, 1157 (D.C. Cir. 1992).  The purpose of such awards is to compensate the plaintiff for any delay in payment resulting from the litigation.  <u>See id.</u>  No other court has awarded pre-judgment interest under the per diem approach.  This is so even though, as here, the wrongful acts took place decades before the litigation. Courts applying the per diem formula have found that the $10,000 per day award to be fully compensatory.  <u>E.g.</u>, <u>Daliberti</u>, 146 F. Supp. 2d at 26.  When an award without pre-judgment interest fully compensates a plaintiff, an award of pre-judgment interest no longer has the intended compensatory purpose and should be denied.  Further, it would inequitable to award prejudgment interest on plaintiffs' per diem awards when no other FSIA plaintiffs  have similarly benefitted.

### B.       Pain and Suffering After Captivity

In some cases, the per diem amount will adequately compensate plaintiffs for pain and suffering both during and after captivity, <u>Daliberti</u>, 146 F. Supp. 2d at 26; however, this is not one of those cases.  In this case, plaintiffs suffered physical and mental harm that has endured for the past

25 years and will likely continue to endure throughout the rest of their lives. Not only do plaintiffs continue to suffer physical disabilities, such as tinnitus, but they have had continued difficulty in daily living, in social interactions, and in employment. A $1,050,000 pain and suffering award is lower than numerous other such awards in like cases and does not fully compensate plaintiffs.

In Acree v. Islamic Republic of Iraq, the court was faced with awarding damages to American soldiers who had been captured and tortured during the Gulf War of 1991. The Acree court awarded plaintiffs a lump sum for pain and suffering felt after captivity.[5] Acree, 271 F. Supp. 2d at 220-21. That court's discussion is apt:

> Each [plaintiff] has had to learn to deal with a life-shattering experience. Some have undergone recurrent painful medical procedures to seek to undo the physical injury done by the Iraqi torturers. Some have seen their marriages and family lives disrupted. Others have suffered in their professional lives. All have been profoundly affected and may continue to suffer for the rest of their lives. Michael Ambrose, the Director of the Repatriated Prisoner of War Program at the Naval Operational Medicine Institute (NOMI), noted that "many of the POWs continue to suffer from lingering effects of the injuries and medical problems incurred during captivity ... and many of these will persist throughout the lifetime of the patients affected.

Id. at 220. The Acree court also recognized the particularly severe emotional harm that certain of the POWs suffered as a result of their captivity. Id. One such POW, Clifford Acree, was described as suffering the following: In 1992, he was

> diagnosed with Post-Traumatic Stress Disorder ("PTSD") arising from his mistreatment in Iraq. In 1998, while on assignment to NATO, he suffered what was diagnosed as a Major Depressive Episode coincident with a recurrence of PTSD. He returned to the United States, where he was placed on medical leave during seven months of psychiatric treatment. He still suffers a number of problems caused by his captivity, including rapid and irregular heartbeat, low back pain, night sweats, headaches, nervousness when stressed, irritability when tired, numbness and tingling in his upper extremities, and some hearing loss and tinnitus.

---

[5]As already noted, the Acree court also awarded lump sums for pain and suffering felt during captivity; it did not use the per diem method to calculate damages.

Id. at 187.  The effects suffered by Acree and many of his fellow POWs are all too similar to the effects that plaintiffs in this case have endured and will likely endure.  On this basis, the Court will award each plaintiff the same $7,000,000 amount of damages for pain and suffering felt after captivity that the Acree court awarded to severely injured POWs such as Clifford Acree.  See id. This award brings each plaintiff's total pain and suffering award to $8,050,000 a figure that, to the Court, sufficiently reflects plaintiffs' total pain and suffering.


### C.      Medical Expenses

Mr. Price shall be awarded $14,221.85 for past medical expenses for treatment received from Dr. Decker.  See Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 272-73 (D.D.C. 2003) (permitting damage award in FSIA case for cost of medical services). There is no evidence to support a similar award for Mr. Frey.


### D.      Lost Wages

Lost wages have been awarded as damages in FSIA cases.  Campuzano, 281 F. Supp. 2d 258, 272-73 (D.D.C. 2003); Acree, 271 F. Supp. 2d at 221 n.17; Daliberti, 146 F. Supp. 2d at 26. Plaintiffs seeks an award of lost wages in this case.  While the evidence shows that plaintiffs' careers have been affected by their experience in captivity, plaintiffs have not, for the most part, met their burden under Hill v. Republic of Iraq to "prove the amount of damages," in this case, lost wages, "by a reasonable estimate."  Hill, 328 F.3d at 684.

Plaintiffs rely on the report and deposition of Dr. Wilbratte.  Dr. Wilbratte estimates that, before addition of inflation or interest, Mr. Frey's past lost wages come to $3,649,033 and future lost

wages comes to $2,167,587.  For Mr. Price, the numbers are $3,246,831 in past lost wages and $1,673,231 is future lost wages.   While Dr. Wilbratte explains his methodology – essentially lost wages equals projected wages minus actual wages – he fails to say anything of substance about projected wages, either what these are or how these are calculated.  Accompanying Dr. Wilbratte's silence on this matter are records of plaintiffs' income from the late 1970s through present day.  In 1979 and 1980, Mr. Price's salary was about $63,000 and $65,000, respectively.  For the next five years – right after his captivity –  he made significantly less.  However, in 1986, he made over $85,000 and from 1987 through 2001 he brought in a salary of over $100,000 a year, and in some case, over $200,000.  Similarly, Mr. Frey had a salary of about $68,000 in 1979 and $66,000 in 1980.  Though his salary took a significant hit in 1981 and 1982, by 1983 his salary was $64,727.  From that point, his salary began a steady upward climb into the six figures where it remained, with one exception, from 1989 to 1998.  Mr. Frey himself concluded, in evaluating his salary record, that, with the exception of the period between 1981-82, "it is difficult to point with certainty to any substantial loss of income."  (Exh. 19.)

Given the size of and increases in plaintiffs' wages, Mr. Frey's candid assessment, and the lack of detail in Dr. Wilbratte's report, the Court finds Dr. Wilbratte's multi-million dollar estimates of lost wages to be an unreasonable estimate, and the Court `will not award the amount he suggests for past wages and will not award damages for future lost wages.[6]  Still, the Court concludes that

---

[6]The Court also worries about Dr. Wilbratte's apparent decision to add to each year's lost earnings figure the amount of $23,5000, representing the foreign tax credit.  First, it seems odd to the Court that Dr. Wilbratte would assume that the plaintiffs would continue to work overseas for perpetuity given that each had only recently started a stint of overseas employment.  Second, Dr. Wilbratte apparently uses the fixed figure of $23,500 for each year without investigating whether that number increased or decreased over the 25 years – or even determining whether the credit

plaintiffs' captivity did severely affect plaintiffs' ability to earn a living in the years immediately following their captivity – the years in which there is an evident salary dip.  The Court will award Mr. Frey $250,000[7] and award Mr. Price $422,000[8] for past lost wages.  In addition, the Court will award Mr. Frey lost wages from 2001 until 2013, totaling $1,000,000.[9]  This period beings with the traumatic events of September 11, 2001 and ends at the time when Mr. Frey would be expected to retire.  The events of September 11 exacerbated Mr. Frey's memories of his captivity in Libya, abruptly prevented him from continuing full-time work, and caused him to seek isolation in his Del

---

still exists today.  Third, Dr. Wilbratte never explains how the credit actually works.  To the Court, it appears that the foreign tax credit would exempt Americans abroad from paying tax to the United States in the amount of a tax that they have paid to a foreign sovereign.  If this is the case, then the foreign tax credit is irrelevant to lost wages as it does not affect plaintiffs' wages but which sovereign gets their tax dollars.  The relevant inquiry would be whether paying taxes as Americans in Libya saved plaintiffs money overall when compared with what they would pay in taxes as Americans in the United States.

[7]In 1980, Mr. Frey made $66,297 and in 1983, Mr. Frey made $64,727.  Crudely assuming he would have made the average of these sums each year during the interval where his salary dropped, he would have made $65,512 each year.  Mr. Frey likely lost $65,512 in 1981 and $50,813 in 1982, totaling $116,325.  Taking into account Dr. Wilbratte's 3.25 percent inflation rate, (Exh. 5.), the Court finds that $250,000 is the proper amount to compensate Mr. Frey for lost wages.

[8]In 1980, Mr. Price made $65,807 and $85,051 in 1986.  Crudely assuming he would have made the average of these sums each year during the interval where his salary dropped, he would have made $75,429 each year.  Mr Price likely lost $63,108 in 1981, $56,675 in 1982, $40,906 in 1983, $29,620 in 1984, and $18,572 in 1985, totaling $208,881.  Taking into account Dr. Wilbratte's 3.25 percent inflation rate, (Exh. 5.), the Court finds that $422,000 is the proper amount to compensate Mr. Price  for lost wages.

[9]The Court finds that $1,000,000 is a reasonable estimate of lost wages for this period.  The Court estimates that Mr. Frey has and will continue to lose approximately $100,000 per year. While Mr. Frey made more than $100,000 in wages in some years, the evidence shows that he has been able to maintain a few part time jobs: in 2002, for example, he brought in wages of just over $60,000.

Mar, California home.  A similar award will not be given to Mr. Price, because the evidence shows

that he has been able to continue full time work.



A judgment consistent with these findings shall issue this date.


Signed by Royce C. Lamberth, United States District Judge, July 26, 2005.